UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARLON STAMPS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 09 C 7026 |
| v. | ) |
| | ) Magistrate Judge Arlander Keys |
| MICHAEL ASTRUE, Commissioner | ) |
| of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Marlon Stamps, moves this Court, pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, to reverse or remand the final decision of the Commissioner of the Social Security Administration (the "Commissioner"), who denied his claim for Disability Insurance Benefits ("DIB"). 42 U.S.C. § 401, et seq. (West 2007). Mr. Stamps seeks retroactive and prospective benefits. The Commissioner has filed a cross motion for summary judgment, seeking an order affirming his final determination. For the reasons set forth below, the Court denies the Plaintiff's Motion for Summary Judgment, and affirms the decision of the Commissioner.

### Procedural History

On May 16, 2005, Mr. Stamps filed an application for DIB, alleging that he had suffered from disabling back pain since August 30, 2004. R. at 145. The claim was initially denied on July 6, 2005. R. at 112. Mr. Stamps requested reconsideration

on September 24, 2005.  R. at 111.  The Commissioner affirmed the denial on December 8, 2005, and  Mr. Stamps filed a timely written request for hearing on January 9, 2006, pursuant to 20 CFR 404.929 et seq.  R. at 105, 16.

Administrative Law Judge ("ALJ") Helen Cropper held a hearing on July 17, 2008 in Chicago, Illinois.  R. at 475 – 601. The ALJ issued a decision denying benefits on September 22, 2008, finding that Mr. Stamps was not disabled within the meaning of the Social Security Act.  R. at 16-34.  Mr. Stamps filed a request for review by the Appeals Council, which was denied on October 9, 2009, making the ALJ's September 22, 2008 decision the Commissioner's final decision.  R. at 5 – 7.

On November 9, 2009, Mr. Stamps filed a complaint in the United States District Court for the Northern District of Illinois, seeking review of the Commissioner's determination under 42 U.S.C. §405(g).  The parties consented to proceed before a United States Magistrate Judge, and, on January 15, 2010, the case was reassigned to this Court.

<u>Factual History</u>

A. Hearing on July 17, 2008

At the hearing on July 17, 2008, the ALJ heard from Mr. Stamps, a medical expert, and a vocational expert.

## 1. Mr. Stamp's Testimony

Mr. Stamps testified that he was 40 years old at the time of the hearing, he has never been married, and he has an eleven year old child who does not live with him. R. at 514 – 15.

With regard to his income, Mr. Stamps testified that he owns a building with three units, which he bought with $10,000 he received following a car accident. R. at 517, 548. Mr. Stamps lives in one unit, and collects rent from tenants living in the other two units. R. at 517. When the tenants pay rent, Mr. Stamps receives $750 from one tenant and $600 from the other. R. at 517. He owns another building with four units, which he also rents to tenants. R. at 518. Mr. Stamps stated that he did not have any other source of income. R. at 518. Mr. Stamps testified that he does not have insurance, but he pays property taxes on the building through a Workers' Compensation settlement. R. at 515-16. This settlement occurred in September 2006. R. at 516. Mr. Stamps received $105,000 in the settlement, which he has "just about" exhausted. R. at 516. Mr. Stamps testified that he received a "couple hundred dollars" after someone hit his car in May 2006. R. at 557.

With regard to his education, Mr. Stamps stated that he completed high school and learned carpentry at the Washburn Trade School. R. at 519. Mr. Stamps confirmed that he can read, write, and do arithmetic. R. at 520.

Mr. Stamps testified that he has a valid driver's license without any restrictions, but he only drives his pickup truck occasionally. R. at 520. Mr. Stamps testified that he drives between one and three times per week, and his fiancé drives him when she is not busy. R. at 520-521. Mr. Stamps testified that he could not work at the time of the hearing, because he cannot use a bathroom by himself, has no strength on the right side of his body, and cannot have sex. R. at 537. Mr. Stamps testified that his fiancé cleans his home and does the laundry, but he washes dishes and occasionally picks up meals for himself. R. at 549 - 550. Regarding his interactions with tenants, Mr. Stamps stated that he collects rent, pays bills, rarely cuts the grass, and hires someone to clean the building. R. at 551 - 552. Mr. Stamps testified that he last washed his car in 2007. R. at 553

Mr. Stamps testified that he last worked in 2004, one month before his surgery, as a machine operator for Entenmanns Bakery. R. at 521. He began working for Entenmanns in 1994. R. at 524. While employed there, Mr. Stamps operated mixing, stacking, and forklift machinery and repaired this machinery occasionally. R. at 522, 525. Before the surgery, Mr. Stamps testified that he did not have trouble performing the work, including lifting between 50 to 100 pounds at a time. R. at 523. Prior to his employment at Entenmanns, Mr. Stamps held a number of short-term jobs: he sorted mail at Technisort in high school, worked for

4

Sears after college, and then drove and washed 18-wheel trucks at Transport Mobile. R. at 526. Mr. Stamps also worked as an oven operator, stacker, and packer for Maryanne Bakery for a year and a half and at Golden Dip bakery and Dana Corporation, performing the same sort of unskilled labor as in the other bakeries. R. at 529 - 530. He worked for Sloan Vale, which manufactured the castings in bathrooms, where he operated a molding, casting, and punch press machine. R. at 530. Mr. Stamps was able to lift up to 50 pounds in this position. R. at 530. Mr. Stamps also testified to various other short-term jobs he held prior to Entenmanns, where he worked without incident. R. at 531-33.

Mr. Stamps testified that he left Entenmanns after having surgery. R. at 523. Following the surgery, Mr. Stamps was placed on light duty for six months, where the employer wanted him to clean windows and sweep floors. R. at 523. Mr. Stamps testified that he was unable to perform the light duty tasks, so he sat in the cafeteria. R. at 523. Mr. Stamps stated that all but one doctor said he could not return to regular duty nor to a lighter sitting job. R. at 524. Mr. Stamps said he did not ask his employer for a sitting job, because he did not believe the jobs were available, especially since he did not have computer or office work credentials. R. at 524. Mr. Stamps testified that Entemanns ended up closing the bakery plant sometime after his surgery, forcing him out of his job. R. at 525.

Mr. Stamps stated that he was being treated for incontinence at the time of the hearing. R. at 538. Mr. Stamps testified that his weight at the hearing was 280 pounds, having gained weight increasingly in the past months. R. at 545-46. Mr. Stamps testified that the nerve study on the nerves in back was normal. R. at 539. Describing his lower back pain, Mr. Stamps said the pain caused him to undergo back surgery, but the pain has not improved since. R. at 540. Mr. Stamps added that the lower back pain extends through his right leg and has caused some swelling in his right foot. R. at 540. He testified that he feels right left weakness daily when he walks or stands, but not when he sits, and described tingling, numbness and weakness in his right hand. R. at 542-43. Mr. Stamps stated that he can stand for 15 to 20 minutes at a time before his lower back begins to hurt. R. at 558. Mr. Stamps testified that he was only able to walk about one half of a block. R. at 560. Mr. Stamps stated that he was unable to bend over to pick up dropped items or put shoes on himself. R. at 561-62. He can sit for 15 to 20 minutes until his right leg becomes numb and he has to stand. R. at 561.

Mr. Stamps testified that he also has mental and emotional problems, and that his inability to have sex and to help his daughter at the age of 40 years old troubles him. R. at 546-47. Mr. Stamps testified to suffering from emotional problems since his father recently died of cancer. R. at 546. Mr. Stamps

testified that he cannot sleep for a long period because of the pain and that he has crying spells two or three times every week, which last for 15 to 20 minutes. R. at 563-64. Mr. Stamps stated that his interactions with family and friends, including his daughter and his fiancé, have become much less frequent. R. at 554.

## 2. Testimony of Dr. William Newman, Medical Expert

Dr. William Newman, a medical expert ("ME"), also testified at Mr. Stamps' hearing. R. at 564. The ME testified that he did not have any prior personal or professional contact with the claimant. R. at 564. The ME testified that, from an orthopedic standpoint, Mr. Stamps did not have orthopedic problems that were so severe as to medically meet or equal a listing impairment. R. at 570. The ME stated that Mr. Stamps did not have peripheral neuropathy, radiculopathy, or a herniated disc; rather, the ME worried that Mr. Stamps had potentially had a stroke which caused the incontinence. R. at 570. The ME stated that Mr. Stamps could perform sedentary work and lift ten pounds occasionally, even if he had had a stroke. R. at 572.

Under examination by plaintiff's attorney, the ME testified that he considered Mr. Stamps' obesity and depression when forming his opinion. R. at 581. The ME testified that he noticed an inconsistency between Mr. Stamps' normal EMG and the weak grip strength in his right hand. R. at 575. The ME also

identified an inconsistency between a finding by Spine & Joint doctors of neurological deficits and the subsequent normal EMG. R. at 579. The ME testified to inconsistencies where reports from physical examinations of Mr. Stamps reflect sluggish reflexes and numbness, conflicting with other reports of normal reflexes and sensation. R. at 580. The ME stated that the 2008 finding of absent bilateral upper extremity reflexes is not indicative of an issue, especially when reflexes are absent on both sides. R. at 580. The ME stated that a person might not get the reflex if he is nervous and unable to relax completely. R. at 580. The ME testified that his opinion differed from the RFC opinion given by the Spine & Joint clinic doctors, because the ME looked at "the whole picture." R. at 582.

### 3. Testimony of Frank Mendrick, Vocational Expert

In addition to Mr. Stamps and the ME, the ALJ heard from Mr. Frank Mendrick, a vocational expert ("VE"). R. at 583. The VE testified that Mr. Stamps performed semi-skilled work at the medium level when employed to run a stacker; he worked at a medium level of semi-skilled labor when employed as a bakery mixer; when employed as a packer, Mr. Stamps performed unskilled, medium level work; he performed unskilled, light exertional level when running an oven; as a washer and driver of a truck, Mr. Stamps performed semi-skilled work at a medium level; and he performed unskilled labor at the medium level when he worked in

molding, casting, and punch press. R. at 583-84. The VE
testified that Mr. Stamps performed all of his past jobs the way
the jobs are typically performed, and noted that his light
driving skills were transferrable from his semi-skilled work. R.
at 584. The VE also testified that there are machines Mr. Stamps
operated that could be run at a light exertion level; for
example, the VE testified that there are molding machines that
run at sedentary level, despite some of the machines requiring
only unskilled labor. R. at 584.

The ALJ described to the VE a hypothetical person who
matched Mr. Stamps in age, education, and background and had Mr.
Stamps' physical and mental attributes. R. at 584. The ALJ
added that the VE should assume, for purposes of the
hypothetical, that the hypothetical person could not perform
constant repetitive pushing or pulling against resistance with
the right lower extremity; he should never climb ladders, ropes,
or scaffolds or work on moving or unstable surfaces; and he could
only occasionally climb ramps or stairs and stoop, kneel, crouch,
or crawl. R. at 584-85. The VE testified that, while the
hypothetical individual would not be able to perform Mr. Stamps'
past relevant work, there were jobs that existed in the region
that would be available to such a person. R. at 585. The VE
testified that the hypothetical individual could perform the jobs
of general assembly worker (approximately 5,500 jobs in the

region), simple inspection worker (approximately 2,500 jobs in the region), and hand laborer (approximately 4,500 jobs in the region). R. at 585.

When questioned by Plaintiff's counsel, the VE stated that these jobs do not require bending, since the jobs are classified as bench work. R. at 587. The VE stated that a worker might need to bend occasionally to pick up something he might have dropped on the floor, but that when a product is finished, the worker need only place the product on a conveyer belt or wait until a material handler comes to pick up the item. R. at 587. The VE testified that the jobs did not require socialization, but a person who argued constantly with coworkers and supervisors would be terminated. R. at 589.

The ALJ then altered the description of the hypothetical person with all the same limitations but limited to sedentary level work. R. at 585. The VE testified that such a person could perform the jobs of general assembly worker (approximately 2,000 in the region), simple inspection worker (approximately 1,200 in the region), and hand laborer (approximately 1,500 in the region). R. at 585. The VE stated that both light and sedentary general assembly, simple inspection, and hand laborer jobs would require frequent use of both hands. R. at 588. The VE testified that assembly and packing work requires less fine motor skills than inspection, which requires fingering and more

fine motor skills. R. at 588-89. The VE testified that a person who cannot lift anything, stand for only ten minutes, sit for only fifteen minutes at a time, and stand and walk for a combined total of less than two hours per day is considered able to perform less than sedentary work. R. at 586. The VE stated that there is no competitive work at the less than sedentary exertion level. R. at 586.

The VE explained that the Department of Labor requires that the worker be engaged at the job eighty percent of the time in an eight hour day, or fifty minutes of every hour. R. at 585-86. If the person was distracted by pain, fatigue, or depression for more than twenty percent of the workday, such a person could not hold the job. R. at 586. The VE stated that the national average among factories for missing work is seven days per year, with eighty percent timely arrival to work. R. at 588.

## B. Medical Evidence

### 1. Medical Records From Prior to the Alleged Onset Date

Mr. Stamps submitted medical records from prior to the currently alleged onset date. R. at 291-315. On September 25, 2002, a Concentra Medical Center report indicated that Mr. Stamps hurt his shoulder while lifting 100 pound bagel trays. R. at 291. The Concentra doctor, Kevin Thompson, M.D., gave Mr. Stamps ibuprofen, instructed Mr. Stamps to ice his shoulder, and stated that Mr. Stamps should only follow up as needed. R. at 291.

On September 24, 2003, Mr. Stamps returned to Concentra Medical Center complaining of lower back pain, which had gradually worsened since September 19, 2003. R. at 292. Mr. Stamps also reported pain in his right leg, but said he did not have any lower extremity numbness, tingling, or weakness. R. at 292. Mr. Stamps walked with an antalgic (pain avoiding) gait. R. at 292. The report shows Mr. Stamps had moderate tenderness in the right lumbar region. R. at 292. Moderate pain reduced his range of motion in all directions, but basic tests were otherwise normal. R. at 292. The doctor prescribed naproxen and cyclobenzaprine to remedy the lumbar strain. R. at 293. The doctor scheduled Mr. Stamps for physical therapy three times a week for one to two weeks. R. at 293. The doctor also wrote that Mr. Stamps should be placed on light work duty, meaning he should not engage in repetitive lifting of more than five pounds, pushing/pulling more than five pounds, or bending. R. at 293.

Additionally, the doctor suggested that Mr. Stamps should alternate between sitting, standing, and walking while at work. R. at 293. Mr. Stamps returned to Concentra on September 26, 2003, saying his symptoms had remained stable. R. at 299. Mr. Stamps did not have any new complaints, but said that he did not think the prescribed medication did enough to relieve his pain. R. at 299. Having attended a session of physical therapy, Mr. Stamps reported only minimal improvement. R. at 299. The doctor

advised Mr. Stamps of the same light duty restrictions, but changed his medications, discontinuing naproxen and cyclobenzaprine, and precribing vicodin at bedtime. R. at 299. Mr. Stamps returned on September 30, 2003, reporting no change in pain despite the physical therapy. R. at 300. On October 1, 2003, Mr. Stamps felt overall improvement, including walking better, but the back pain persisted as before. R. at 302.

By October 10, 2003, Mr. Stamps returned to Concentra, where he noted more improvement from physical therapy. R. at 306. Mr. Stamps still complained of lower back pain radiating down his right leg. R. at 306. Additionally, Mr. Stamps told doctors he suspected a hernia on his right side, which caused him to feel a pull to his right abdomen. R. at 306. However, the physical examination revealed normal findings, including a normal gait and a negative straight leg raise (SLR) test. R. at 306. The doctor prescribed voltaren for Mr. Stamps and continued the light work duty suggestions. R. at 306. Mr. Stamps returned to Concentra on October 17, 2003 to discuss the results of a lumbar MRI done on October 14, 2003. R. at 308. A radiologist interpreted the MRI results, which indicated that Mr. Stamps had a herniated L5-S1 disc, with mild bilateral neural foraminal narrowing (constriction of the opening where nerves pass through). R. at 308. Mr. Stamps was referred to an orthopedic specialist, Dr.

Charles Mercier, for further evaluation and possible treatment. R. at 308.

Mr. Stamps had his initial evaluation by Dr. Mercier on October 29, 2003. R. at 309. Mr. Stamps had pain at L5 and over the right sciatic notch, which increased with shoulder compression and any trunk rotation. R. at 309. Mr. Stamps had a reduced range of motion, where he could only flex to 45 degrees as opposed to the normal 90 degree. R. at 309. Dr. Mercier found that Mr. Stamps was neurologically intact in the lower extremities. R. at 309. Dr. Mercier's findings showed a small disk protrusion at L5-S1, but he noted specifically that Mr. Stamps had evidence of false reporting to clinical testing on his clinical exam. R. at 309. Dr. Mercier gave Mr. Stamps a lumbar epidural steroid injection (ESI) and told Mr. Stamps to return to work. R. at 309. Mr. Stamps reported improvement after the first ESI, so Dr. Mercier proceeded with a second ESI and also gave him Celebrex on January 14, 2004. R. at 310. Following the second ESI, Mr. Stamps told Dr. Mercier that his pain had actually increased, with continuing right lower back pain and pain in his right leg. R. at 311. On February 18, 2004, Mr. Stamps declined the recommended third ESI. R. at 311. Dr. Mercier ordered a myelogram CT and gave Mr. Stamps darvocet for his pain; all physical examination findings were normal, with a negative SLR test. R. at 311.

Dr. Mercier ordered a lumbar CT and a lumbar myelogram, which were both performed at Gottlieb Memorial Hospital on April 20, 2004. R. at 399. Dr. Mercier reviewed the results of the tests. R. at 399 - 400. The tests showed that Mr. Stamps had a herniated disc at the L5-S1 level and nerve root impingement. R. at 399 - 402. On May 5, 2004, Mr. Stamps returned to Dr. Mercier for a follow-up appointment, again reporting persistent bilateral radiating lower back pain greater on the right than the left side. R. at 312. Mr. Stamps continued to have a reduced range of motion, but the findings were normal, including a negative SLR test in the seated position. R. at 312. Dr. Mercier discussed various options with Mr. Stamps, including possible surgery. R. at 312. Mr. Stamps wanted time to think about the surgery, so Dr. Mercier told him to continue working as usual. R. at 312.

A progress report on May 19, 2004 shows that Mr. Stamps remained undecided about whether or not he would have the surgery. R. at 313. The decision was still pending as Mr. Stamps returned for another follow-up with Dr. Mercier on June 2, 2004. R. at 314. During this time, Mr. Stamps continued to work with some modifications on account of the severe lower back pain. R. at 314. On June 16, 2004, Mr. Stamps informed Dr. Mercier that he still had persistent pain, so he was ready to proceed with surgery. R. at 315. Dr. Mercier noted that Mr. Stamps ran his own landscaping business, but did not know whether this type

of work was a contributing factor to Mr. Stamps' back pain. R. at 315. Dr. Mercier scheduled the surgery and told Mr. Stamps to continue on light duty at work. R. at 315.

## 2. Disability Reports

Mr. Stamps submitted several disability reports to support his history of physical impairments. In these reports, Mr. Stamps stated that he could not bend, sit, or walk for long periods of time. R. at 155, 167, 176. Mr. Stamps said that he could not lift more than 15 pounds. R. at 155, 167, 176. Additionally, Mr. Stamps reported sharp stabbing pains in the lower middle section of his back, buttocks, and straight down his right leg. R. at 176. Mr. Stamps complained of numbness on his entire right side, with pain worsening as the weather turns colder. R. at 176. Mr. Stamps also complained that the pain overwhelmed his ability to perform sexually. R. at 176.

Mr. Stamps also answered questions regarding his daily living. R. at 170, 179. Mr. Stamps indicated he had trouble getting dressed, bathing, showering, laying in bed, or sitting on the toilet without help. R. at 170, 179. Brushing his teeth was the only personal need Mr. Stamps could do on his own. R. at 179.

## 3. Medical Records after the Alleged Onset Date

On September 18, 2004, Dr. Mercier performed back surgery on Mr. Stamps. R. at 218. The procedures performed included a

micro-laminectomy, discectomy, decompression, foraminotomy, and partial fasciectomy L5-S1 on the right side. R. at 219. On the date of his surgery, Mr. Stamps had been assessed, where all his neurological finding were within normal limits. R. at 425. However, the admission assessment shows that Mr. Stamps had complained of continuous lower back pain that did not radiate. R. at 425.

The report of operation from Gottlieb showed that the surgery went smoothly, and that Mr. Stamps was in good condition immediately after the surgery. R. at 391. Mr. Stamps denied pain and was able to move both legs and feet before being transferred to the recovery room. R. at 460. Mr. Stamps was admitted later that day. R. at 412. The admission, though unanticipated, related to the lumbar disc displacement. R. at 412. While in the hospital, Dr. Mercier prescribed Anzemet IV antibiotics, which began following the surgery. R. at 414. This suggests that Mr. Stamps may have developed an infection during the admission process. R. at 414. However, nurses' reports show that Mr. Stamps had strong strength of movement of his extremities following the surgery, on both September 18 and 19. R. at 418. The nurses' daily patient care records show that Mr. Stamps did not have any adverse drug events and that he was "up with assistance" on the days following the surgery. R. at 419. Mr. Stamps used a walker to walk to the bathroom and in the

hallway. R. at 419. Gottlieb discharged Mr. Stamps on September 20, 2004 with a standard walker, which had been approved by Mr. Stamps' workman's compensation insurer. R. at 434.

Mr. Stamps returned to see Dr. Mercier on September 30, 2004, where he complained of lower back pain and some right leg pain. R. at 316. Dr. Mercier redressed the wounds, noting no signs of infection. R. at 316. At that time, Mr. Stamps did not work. By October 7, 2004, Mr. Stamps felt much better and could walk normally without a walker. R. at 317. Dr. Mercier removed the staples from the wound, which remained uninfected. Dr. Mercier instructed Mr. Stamps to return to work in a sedentary job at the bakery. *Id.* During this visit, Dr. Mercier also prescribed another course of physical therapy to begin shortly thereafter. However, at his check-up on October 21, 2004, Mr. Stamps had not returned to work, because the plant had closed. R. at 318. Mr. Stamps felt better, but complained of some numbness in his incision and the buttocks areas. R. at 318. Dr. Mercier found a healthy and healing wound site and negative SLRs. R. at 318. Dr. Mercier did note that the plant closing would impact Mr. Stamps' "willingness to make a timely and rapid recovery," but prescribed more physical therapy. R. at 318.

Mr. Stamps attended physical therapy sessions during October and November 2004. R. at 319-36. He continued to have an antalgic gait, guarded transitional movements, and tenderness of

the lumbar area. R. at 319-20. The physical therapist instructed Mr. Stamps to perform a home exercise program. R. at 320. The physical therapist noted on October 29, 2004 that Mr. Stamps reported worsening of his injury status because he performed activities beyond his tolerance. R. at 328. These activities, which included changing a car tire, walking, and bending, aggravated Mr. Stamps' condition. R. at 328. Throughout this time, Mr. Stamps did not work, due to the closed plant. R. at 319-36.

On November 4, 2004, Mr. Stamps told Dr. Mercier that he was doing "extremely well without much pain" after surgery; however, he stated that the pain started again since beginning therapy. R. at 337. Dr. Mercier instructed Mr. Stamps to continue with physical therapy and prescribed more Celebrex for the pain. R. at 337. Through November and December, Mr. Stamps attended physical therapy sessions. R. at 338-79. Mr. Stamps complained of new pain in his neck and left thigh on November 17, 2003 at physical therapy, but said his back felt better. R. at 347. Dr. Mercier ordered Mr. Stamps three more weeks of physical therapy during a check-up on November 18, 2003. R. at 351. The physical therapist continued to see very slow progress in Mr. Stamps, but on December 3, 2004, Mr. Stamps' symptoms worsened due to increased walking and sweeping his steps. R. at 361. During a regular visit with Dr. Mercier, Mr. Stamps reported incisional

pain, though Dr. Mercier noted the incision had healed well. R. at 373. Mr. Stamps complained that his SLR test was uncomfortable, but the results were negative. R. at 373. Dr. Mercier ordered another MRI with gadolinium for evaluation, gave Mr. Stamps Motrin for his symptoms, and instructed him to continue with physical therapy. R. at 373.

On January 3, 2005, Dr. Mercier saw Mr. Stamps, who was complaining of lower back pain on the right side radiating into his buttocks area. R. at 380. After performing the SLR test, the results were "questionably positive" on the right side. R. at 380. Dr. Mercier reviewed the results from an enhanced MRI of the lumbosacral spine, which revealed uncomplicated postoperative changes at L5-S1, with degenerative disk bulge and a postsurgical tear of the annulus fibrosis. R. at 380. Dr. Mercier did not find any disk herniation or any evidence of significant spinal stenosis. R. at 380. Dr. Mercier informed Mr. Stamps that he did not require further surgery and may need just "some brief, short-term pain management." R. at 380. Dr. Mercier referred Mr. Stamps to Dr. Heller for a consultation and told Mr. Stamps he could return to work with restrictions. R. at 380.

Dr. Heller's initial meeting with Mr. Stamps occurred on January 13, 2005. R. at 381. She observed Mr. Stamps as "healthy-looking" and "seemingly well-muscled." R. at 382. Dr. Heller did note Mr. Stamps sitting comfortably at the edge of the

examination table without demonstrating any signs of distress or discomfort. R. at 382. She described Mr. Stamps as demonstrating "excess pain behavior," because she observed normal strength and reflexes. R. at 382. Dr. Heller did not detect any muscle spasms and noted a normal gait. R. at 382. All neurological findings were normal, and Mr. Stamps performed a normal SLR, but he winced in pain during the test. R. at 382. Dr. Heller prescribed Skelaxin to relax his muscles and referred Mr. Stamps to have a functional capacity evaluation (FCE) done. R. at 383. Dr. Heller recommended that Mr. Stamps return to light duty work if available. R. at 383.

On February 3, 2005, Mr. Stamps returned to Dr. Heller after undergoing an FCE and some work conditioning with therapist, Gayle Abbey. R. at 384. Ms. Abbey told Dr. Heller that Mr. Stamps was improving functionally, despite his complaints. R. at 384. Ms. Abbey reported that Mr. Stamps completed assigned tasks each day, including dead lifts of 24 pounds, 28 pounds knuckle to shoulder, 28 pounds overhead, and 28 pounds for a one hundred foot carry. R. at 384. Ms. Abbey noted some inconsistencies during the test and opined that Mr. Stamps could perform at a greater physical demand level than he demonstrated during the FCE. R. at 384. Dr. Heller noted that functionally, Mr. Stamps appeared to be doing very well. R. at 385. She recommended that he return to light duty, if available, immediately, and

instructed Mr. Stamps to continue work conditioning five times a week for the next three weeks. R. at 385. Dr. Heller refilled the Skelaxin prescription per Mr. Stamps' request, because it helped him. R. at 385.

At a visit to Dr. Heller on February 11, 2005, Mr. Stamps explained that his poor attendance at the work-conditioning program was the result of conflicting childcare responsibilities, conflicting doctor appointments, and increased pain in his right gluteal area and leg. R. at 386. Though Mr. Stamps complained of severe back pain, Dr. Heller found his physical examination normal and again noted "excessive pain behavior." R. at 387. Dr. Heller specifically noted that Mr. Stamps had refused the pain medication she offered, despite his complaints of pain. R. at 386-87. Dr. Heller recommended that Mr. Stamps had reached his "maximum medical improvement" and should return to full duty work given his normal physical exam. R. at 387.

Dr. Giri Gireesan examined Mr. Stamps on May 24, 2005. R. at 229. Mr. Stamps complained of pain in his lower back and numbness, however, Dr. Gireeson did not find any tenderness, sensory changes, weakness, or reflex changes. R. at 229. Additionally, Dr. Gireeson noted Mr. Stamps had normal ambulation, without any abnormalities in his gait. R. at 229. Mr. Stamps' SLR test on the right side was positive at 70 degrees. R. at 231. His right hamstring measured 4/5 the

strength of the left hamstring.  R. at 231.  Dr. Gireeson reviewed
two sets of MRI's, both pre and post surgical, and diagnosed Mr.
Stamps with discogenic lower back pain.  R. at 231.  With this
diagnosis, Dr. Gireeson opined that Mr. Stamps would be unable to
return to the type of heavy duty work he had performed at the
bakery.  R. at 231.

Mr. Stamps had an initial evaluation at the Ambulatory &
Community Health Network of Cook County, Austin Health Center
(ACHN) on June 1, 2005, where he complained of severe back pain
and requested a refill of his medications.  R. at 255.  Mr.
Stamps weighed 243 pounds at this visit.  R. at 255.  He informed
the ACHN doctor of his past back surgery and physical therapy.
R. at 255.  Mr. Stamps stated that his entire right side, from
the shoulder to the arm and on the right leg to the kneecap, was
weak; he also reported that the muscle relaxing medicine did not
provide enough relief.  R. at 255. The doctor suggested that  Mr.
Stamps have an orthopedic evaluation and return to ACHN for
routine health care.  R. at 256.

Mr. Stamps returned for a follow-up visit at ACHN on
September 7, 2005 and to refill his medication.  R. at 254.  He
told the ACHN doctor that he had never seen the orthopedic doctor
and that his back pain worsened.  R. at 254.  Mr. Stamps had
gained some weight, up to 252 pounds.  R. at 254.  The ACHN
doctor prescribed Motrin and Robaxin and ordered routine lab

23

work.  R. at 254.  On October 5, 2005, Mr. Stamps saw the ACHN doctor, requesting "something in writing" for his workman's compensation claim.  R. at 253.  The doctor again suggested that Mr. Stamps see an orthopedic doctor at Stroger Hospital and ordered routine lab work.  R. at 253.  Mr. Stamps returned to ACHN on October 12, 2005 for lab results and complained that medication only partially relieved his severe lower back pain. R. at 252.  Mr. Stamps had gained weight, now at 255 pounds.  R. at 252.  The ACHN doctors urged Mr. Stamps to see an orthopedic doctor.  R. at 252.

On May 1, 2006, Mr. Stamps went to the West Suburban Medical Center emergency room.  R. at 275.  Mr. Stamps told ER doctors that he had been in a car accident two days prior and suffered lower back and right leg pain since the accident.  R. at 277. The ER nurse wrote that Mr. Stamps presented as mildly ill-appearing and in mild pain distress, but that he had a steady gait.  R. at 278 - 279.  The nurse noted that Mr. Stamps had a slight limp, but he had a full range of motion and no obvious injury.  R. at 279.  The ER doctor described the physical exam findings as normal, diagnosing Mr. Stamps with a lower back strain.  R. at 279.  Mr. Stamps received Motrin and instructions to use ice for the pain.  R. at 279.

On July 26, 2006, Mr. Stamps had a follow-up appointment at ACHN and sought prescription refills.  R. at 251.  He reported

the ER visit to the ACHN doctors and advised them of another scheduled MRI. R. at 251. Mr. Stamps weighed 271 pounds and complained of new "fluttering" in his chest. R. at 251. The doctor ordered a same-day EKG, which returned unremarkable, so the doctor opined that the palpitations related to Mr. Stamps' anxiety. R. at 251. Again, the doctor urged Mr. Stamps to see an orthopedic doctor. R. at 251. Mr. Stamps had a MRI of his lumbar spine at Stroger Hospital on April 10, 2007. R. at 261. The MRI showed degenerative disc disease at multiple levels (L-1/L-2 through L5-S1) and post-surgical changes. R. at 261.

After a year and a half, Mr. Stamps had another follow-up visit with ACHN, where he weighed 275 pounds and had an elevated blood pressure reading at 154/90. R. at 250. He complained of lower mid back pain and decreased strength in the right leg, as well as weakness in his right upper extremity. R. at 250. Mr. Stamps had been treating his pain with ibuprofen and robaxin, but needed a refill prescription. R. at 250. During his physical examination, Mr. Stamps had reduced right grip strength (4/5) and reduced motor strength in his right hip. R. at 250. The doctor thought Mr. Stamps had a cervical problem, so he ordered an EMG, NCV and routine lab work. R. at 250. Mr. Stamps received Neurontin (usually prescribed for nerve injury or damage) and Tramadol (an analgesic), along with a referral to a neurosurgeon for evaluation and possible treatment. R. at 250, 259.

25

One of Mr. Stamps' disability attorneys, Mr. Barry Schultz, arranged for an examination at the Spine & Joint Rehabilitation clinic with Dr. Lafayette Singleton, a neurologist, and Dr. Williams, a psychiatrist. R. at 265-66. Both doctors signed a letter dated March 5, 2008, saying that Mr. Stamps suffers from failed post-laminectomy lumbar surgery, complex regional pain, type 1(CRSPI), moderate to severe degenerative joint disease of both knees and shoulders, cervical spondylitis and depression. R. at 265-66. In the letter, the doctors opined that these medical conditions left Mr. Stamps "totally incapacitated and unable to work in any gainful employment." R. at 266. Additionally, the doctors said Mr. Stamps' prognosis was poor and that he lacks the tolerance and capacity to return to any form of employment in the future. R. at 266.

Shortly thereafter, on March 11, 2008, Dr. Singleton, joined by Dr. Darwin Minnis, prepared a more detailed report of Mr. Stamps' physical examination. R. at 269-73. Neither doctor signed this report. R. at 273. The report reflected that Mr. Stamps had completed a pain questionnaire , where he reported a constant pain level of no less than 7/10 and frequently 9/10. R. at 269. Mr. Stamps also stated that he could not walk at all, sit or stand more than 30 minutes at a time, or perform normal daily or social activities. R. at 270. Mr. Stamps said he was

unable to type or write anything.  When asked to evaluate the
effect of pain on his mood, Mr. Stamps reported feeling anxious,
extremely depressed, extremely irritable, and in an overall
constant bad mood.  R. at 271.  During the physical examination,
Mr. Stamps had high blood pressure (190/100) and heart sounds
revealed an arrhythmia.  R. at 271.  Doctors described Mr. Stamps
as having an abnormal stance, a slow and halting antalgic gait,
and a tendency to fidget.  R. at 271.

Mr. Stamps' right thigh and calf were both smaller than the
left side, but only by 5cm and 2cm respectively.  R. at 271.  Mr.
Stamps had decreased bilateral reflexes in his lower extremities.
R. at 272.  His right forearm and bicep were smaller than the
left side by one and two inches respectively, but the rest of his
arm muscles, though sluggish, were equally active bilaterally.
R. at 272.  Neck tenderness produced a decreased range of motion
through the neck and back.  R. at 272.  Grip strength and pinch
grip on the right side lacked the strength and sensation of the
left side.  R. at 272.  Doctors reported the SLR test as
positive, but did not specify the leg or posture used in testing.
R. at 272.  One or both of the doctors answered a functional
capacity questionnaire about Mr. Stamps, stating that, in the 3
months they had treated Mr. Stamps, they had diagnosed him with
depression, difficulty walking, radiculopathy, failed post-
laminectomy syndrome, CRPS, and possible sleep apnea.  R. at 263.

Mr. Stamps had a follow-up appointment at ACHN on March 26, 2008, where he stated that his back pain had subsided "a little bit." R. at 407. Mr. Stamps weighed 280 pounds and reported significant family stress – his father was diagnosed with prostate cancer and his mother had a mild stroke. R. at 407. The doctor noted that Mr. Stamps had a sad affect, but the physical findings were stable. R. at 407. Mr. Stamps received a diagnosis of cervical and lumbar disc disease. R. at 407. The doctor ordered a cervical MRI and an EMG, arranged an appointment with a neurosurgeon, and increased the prescribed doses of tramadol and Neurontin. R. at 407. The doctor also told Mr. Stamps to take Motrin as necessary for the pain. R. at 407. Dr. James Dorman performed the EMG on March 31, 2008 and interpreted the study as normal, with no evidence of cervical radiculopathy affecting the right upper extremity. R. at 405. On May 5, 2008, Dr. John Keen performed a lumbar MRI at Stroger Hospital. R. at 409. Dr. Keen interpreted the results as showing significant degenerative changes at L5-S1 level, but no nerve root compression. R. at 409. Dr. Keen described the results as a "stable exam" as compared to the April 2007 MRI, which was the most recent. R. at 409.

On July 7, 2008, Mr. Stamps visited ACHN for extreme lower back pain (10/10). R. at 403. Mr. Stamps had missed the neurosurgeon appointment that had been scheduled for the same

28

day.  R. at 403.  The doctor described Mr. Stamps as being in "mild distress" despite the 10/10 pain he had reported.  R. at 403.  Mr. Stamps told the doctor that he had experienced fecal incontinence for months before starting gabapentin, but no urinary incontinence.  R. at 403.  After reviewing the April 2007 and March 2008 MRI reports, the doctor opined that Mr. Stamps would not benefit from any additional surgery.  R. at 403.  The doctor ordered routine lab work, rescheduled the neurosurgeon appointment, increased the dosage of Neurontin, prescribed Neproxen (anti-inflamatory), and asked Mr. Stamps to return in one or two months for a follow-up.  R. at 403.

Dr. Newman, the ME, offered into evidence his opinions regarding this objective medical evidence and the imaging studies.  He testified that a failed post-laminectomy syndrome means that surgery did not accomplish a certain result.  Dr. Newman explained spinal stenosis, describing that the severity can vary – if severe, the stenosis can compress the spinal nerves, but if not severe, the stenosis could have no effect on the affected area.  A normal EMG rules out any significant nerve impingement caused by stenosis or herniation, according to Dr. Newman.  Dr. Newman finally testified that the bilateral absence or reduction in opposite extremities does prove diagnostic of a nerve or spine problem, even though such evidence is an element in evaluating possible spinal impairments.

C. Work History Report

Mr. Stamps also submitted to the ALJ a work history report.
R. at 182. In the report, Mr. Stamps indicated that he had
performed three jobs in the last 15 years. R. at 182. From
March through July 1987, Mr. Stamps worked as a oven operator at
a bakery, where he had to push and pull racks of product and set
up and operate the mixer. R. at 185. At this job, Mr. Stamps
lifted 100 pound bags of ingredients into the mixer and
frequently lifted 50 pounds. R. at 185. His responsibilities
also included loading and unloading bread from the oven. R. at
185. Mr. Stamps supervised six employees at this bakery. R. at
185.

Mr. Stamps reported his second job from July 1988 through
August 1993 as a mixer and set up operator at a bakery. R. at
182. This job required mixing different ingredients to make
various products, drive a forklift, and lift 100 pound bags of
ingredients to put in each mixer. R. at 184. Mr. Stamps also had
to walk up and down four flights of stairs to get a sample of
each mix and walk about ten minutes back over to the mixer. R.
at 184. At this job, Mr. Stamps frequently lifted 50 pounds, but
did not supervise any employees. R. at 184.

The most recent job Mr. Stamps reported lasted from August
1993 through July 2004, where he worked as a machine operator at
a bakery. R. at 182. His responsibilities included setting up

and operating machinery that stacks trays carrying product. R. at 183. Mr. Stamps had to lift trays with product weighing anywhere from 10 – 15 pounds and carry the trays three to five feet in order to "complete" the stack at 19 trays high. R. at 183. If a stack fell, Mr. Stamps had to catch the stack before it fell into the machine. R. at 183. The job also required pushing and pulling racks with product, each weighing up to 80 pounds. R. at 186. Mr. Stamps drove a forklift at this job. R. at 186. He frequently lifted 50 pounds, but did not have a supervisory role. R. at 183.

After the July 17, 2008 hearing, the ALJ held the record open for three weeks to permit Mr. Stamps to submit prescription records, which were missing from the record. R. at 599. The ALJ issued her decision on September 22, 2008. R. at 16-34.

### The ALJ's Decision

In her decision, the ALJ concluded that Mr. Stamps was not disabled under sections 216(i) and 223(d) of the Social Security Act ("SSA"). R. at 34. In making this determination, the ALJ applied the five step sequential analysis outlined in the Social Security Regulations ("SSR"). R. at 17-22. At step one, the ALJ determined that Mr. Stamps had not engaged in any substantial gainful activity since the alleged onset date of August 30, 2004. R. at 18.

At step two, the ALJ found that Mr. Stamps had the following severe impairments: obesity and history of herniated disc in the lumbar spine, treated surgically in 2004. R. at 19. In support of this finding, the ALJ stated that, given Mr. Stamps' obesity, heavier work would be strenuous and might cause a recurrence of severe low back pain. R. at 19. The ALJ stated that the medical records show episodes of recorded hypertension, but noted that the record did not establish the type of damage that would impose significant functional limitations. R. at 19. However, the ALJ found that the contention that Mr. Stamps suffered a stroke immediately following the surgery remained unsupported by evidence. R. at 19. Mr. Stamps' complaint of new neck pain shortly before the hearing did not have evidentiary support to establish that he suffered from a severe medically determinable impairment of the cervical spine or neck that lasted or will last for 12 consecutive months. R. at 20. The ALJ did not consider the hypertension or neck pain as severe, but she took all limitations, both severe and non-severe into consideration in determining Mr. Stamps' RFC. R. at 19-20.

At step three, the ALJ determined that Mr. Stamps did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. at 20. The ALJ considered Listing 1.04A, which applies to spinal disorders, including

herniated discs, in arriving at this conclusion. R. at 20. In support of this finding, the ALJ reviewed the objective medical evidence, noting that the evidence did not support a finding of *persistent* neurological abnormalities. R. at 20. While there was some documentation of neurological defects related to Mr. Stamps' history of herniated disc, the period of clinical abnormalities did not persist for a consecutive 12 months during the relevant time. R. at 20. Other neurological examination findings had frequently been described as normal. R. at 20.

The ALJ relied on the testimony of Dr. Newman, who described the medical evidence as partially inconsistent. R. at 20. Dr. Newman said that imaging studies and clinical exams show Mr. Stamps has had normal strength, reflexes, and sensation throughout the relevant time, but the Spine & Joint Rehabilitation Clinic report suggested that Mr. Stamps had some atrophy in his right arm and leg muscles. R. at 20. The objective findings on MRI, EMG, and nerve conduction studies showed only minimal disc problems that do not cause the same type of weakness that Mr. Stamps reported to doctors. R. at 20.

No listing applied to obesity directly, but SSR 02 - 1p directed the ALJ to follow the National Institute of Health criteria for diagnosis of obesity. R. at 20. SSR 02 - 1p provides that obesity can be the medical equivalent of a listing, even if no recorded listing is met. R. at 21. The SSR

contemplated that multiple impairments related to or exacerbated by obesity can support an equivalence determination. R. at 21. The National Institute of Health criterion includes clinical guidelines on the identification, evaluation, and treatment of obesity in adults. R. at 20. The guidelines classify the degree of obesity according to calculation of Body Mass Index (BMI), which compared the person's weight in kilograms to the person's height in meters squared. R. at 20. The levels are as follows: Level I obesity is a BMI between 30 - 34.9; Level II obesity is a BMI of 35 - 39.9; and Level III extreme obesity is a BMI of 40 or more. R. at 20.

The record established Mr. Stamps' height at 69 inches tall and his weight fluctuated between 230 and 280 pounds during the relevant time. R. at 21. At the time of the ALJ's decision, Mr. Stamps testified that he weighed 280 pounds, which gives him a current BMI at 46.6 (above extreme obesity) and a lowest BMI (at the 230 pound mark) of 38.3 (level II obesity). R. at 21. The ALJ determined that Mr. Stamps' obesity may exacerbate his back pain and limit his endurance, but he did not submit evidence of ineffective ambulation other than the few days post-surgery. R. at 21. Mr. Stamps' obesity did not cause or contribute to any other listing-level impairment documented in the record. R. at 21. The ALJ adopted Dr. Newman's opinion of the evidence, which suggested that Mr. Stamps' physical impairments are not and have

never been so severe as to medically meet or equal a listed impairment. R. at 21. The ALJ adopted Dr. Newman's opinion because it was consistent with and supported by the objective medical and other evidence. R. at 21.

The ALJ determined that Mr. Stamps had the residual functioning capacity (RFC) to perform a wide range of sedentary work as defined in 20 C.F.R. 404.1567(b) and 416.967(b). R. at 21. The ALJ did find that Mr. Stamps' impairments could produce his alleged symptoms. R. at 30. However, the ALJ decided that Mr. Stamps' statement about the intensity, persistence, and limiting effects of the symptoms were inconsistent with the RFC assessment, rendering Mr. Stamps' statements incredible. R. at 30. In making this determination, the ALJ found that Mr. Stamps could not credibly explain his failure to seek treatment for disabling pain, aside from the two treatment visits in October 2005 and February 2008. R. at 30 – 31. Additionally, the ALJ did not accept Mr. Stamps' excuse of not having insurance to cover medical costs, because 1) he was aware that Stroger Hospital and the affiliated ACHN offered free medical care; and 2) he received a workers compensation settlement in October of 2006. R. at 31.

The ALJ also determined that Mr. Stamps' primary reason for not returning to work after the recommendation from Dr. Mercier involved the plant closing, not disabling pain. R. at 31.

35

Further, Mr. Stamps' trip to the ER in January of 2006 reflected normal physical exam findings, including normal lumbar spine exam, gait, and ambulation. R. at 31. The ALJ relied on Mr. Stamps' prescription records, which show only a few prescriptions for pain medication, suggesting the degree of pain to be less severe than what Mr. Stamps described at his hearing. R. at 31. Finally, the ALJ determined that Mr. Stamps' business and personal activities suggested his ability to function despite complaints of back pain. R. at 31. These activities included caring for business tasks related to renting apartments, paying bills, scheduling maintenance, and driving a car, as well as a long-term relationship with Ms. Mitchel, and assisting his family with recent medical problems. R. at 31.

The ALJ found Mr. Stamps capable of lifting and carrying 10 pounds occasionally, but that he should not do repetitive pushing or pulling against resistance with his right lower extremity. R. at 21. Mr. Stamps could stand and or walk for up to two hours in an eight hour workday, while sitting with typical breaks throughout the workday did not pose any problem. R. at 21. Non-exertional limitations, due to obesity, affected the wide range of sedentary work Mr. Stamps could perform. R. at 21. These limitations included never climbing ropes, ladders, scaffolds, working on moving or unstable surfaces, or exposing himself to unprotected heights or unguarded hazardous equipment. R. at 21.

The ALJ found that Mr. Stamps possessed the RFC to occasionally climb ramps or stairs, and stoop, kneel, crouch, or crawl. R. at 21. The ALJ also determined that pain would only rarely distract Mr. Stamps from work to the extent that he was off task and not productive outside of break time. R. at 21.

At step four, the ALJ determined that Mr. Stamps could not perform any past relevant work. R. at 31. The ALJ agreed with the VE's testimony that Mr. Stamps would be incapable of performing any of his past relevant work, all of which were unskilled and ranged from light to medium exertional levels. R. at 32. The ALJ also found that the transferability of job skills was not material to the determination of disability, because using the Medical-Vocational Rules as a framework supports a finding that Mr. Stamps is "not disabled" whether or not Mr. Stamps has transferrable job skills. R. at 32 (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

At step five, the ALJ determined that jobs in significant numbers existed in the national economy that Mr. Stamps could perform. R. at 32. The ALJ acknowledged that Mr. Stamps' ability to work at all exertional levels had been compromised by additional limitations. R. at 32 – 33. The ALJ considered the VE's testimony that an individual with Mr. Stamps' age, education, work experience, and RFC could perform the requirements of representative unskilled sedentary occupations

such as general assembler (2,000 jobs in the regional economy),
inspector (1,200 jobs in the regional economy), or hand laborer
(1,500 jobs in the regional economy). The ALJ specifically found
that Mr. Stamps did not need a sit-stand option while performing
sedentary work and that Mr. Stamps was not significantly limited
in ths ability to use both hands for fine or gross manipulations
of items within the sedentary weight levels. R. at 33. The ALJ
determined that Mr. Stamps was capable of  making a successful
adjustment to other work that exists in significant numbers in
the national economy. R. at 33

Accordingly, the ALJ concluded that Mr. Stamps had not been
under a disability, as defined in the Social Security Act, from
August 30, 2004 through the date of her decision. R. at 33.

### Social Security Regulations

When an individual claims a need for DIB, he must prove the
existence of a disability under the terms of the SSA. In
determining whether an individual is eligible for benefits, the
Social Security Regulations require a sequential five-step
analysis. First, the ALJ must determine if the claimant is
currently employed; second, a determination must be made as to
whether the claimant has a severe impairment; third, the ALJ must
determine if the impairment meets or equals one of the
impairments listed by the Commissioner in 20 C.F.R. Part 404,
Subpart P, Appendix 1; fourth, the ALJ must determine the

claimant's RFC; fifth, the ALJ must decide whether the claimant is capable of performing work in the national economy. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995). At steps one through four, the claimant bears the burden of proof; at step five, the burden shifts to the Commissioner. *Id.*

## Standard of Review

A district court reviewing an ALJ's decision must affirm if the decision is supported by substantial evidence and is free from legal error. 42 U.S. C. §405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere scintilla"; rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). In reviewing an ALJ's decision for substantial evidence, the Court may not "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990).

An ALJ must articulate her analysis by building an accurate and logical bridge from the evidence to her conclusions, so that

the Court may afford the claimant meaningful review of the SSA's ultimate findings. *Steele*, 290 F.3d at 941. It is not enough that the record contain evidence to support the ALJ's decision; if the ALJ does not rationally articulate the grounds for that decision, or if the decision is not sufficiently articulated, so as to prevent meaningful review, the Court must remand. *Id.*

### Discussion

Mr. Stamps argues that the ALJ's decision was wrong for three reasons. First, Mr. Stamps argues that the ALJ did not properly evaluate the medical opinions regarding his functional capacity. Second, Mr. Stamps argues that the ALJ's residual functional capacity assessment was not supported by the record, and that the ALJ erred by not recontacting Mr. Stamp's doctors or sending him for a consultative examination. And third, Mr. Stamps argues that the ALJ did not properly analyze the credibility of his statements.

**A. ALJ's evaluation of the medical opinions regarding Mr. Stamps' functional capacity**

Mr. Stamps argues that the ALJ erred by not giving the opinions of his treating physicians, Drs. Singleton, Williams, Mercier, Heller, Gireesan, Keen, Dorman greater weight than the opinion of the ME, a non-examining physician. It is true that the opinion of a treating physician is generally entitled to greater weight than the opinion of a non-examining physician. 20

40

C.F.R. §404.1527(d)(1). A treating physician's medical opinion will be given controlling weight if it is well-supported by medically accepted clinical and laboratory diagnostic techniques, and if the opinion is not inconsistent with the other substantial evidence in the case record. 20 C.F.R. §404.1527(d)(2). In evaluating a treating physician's opinion, the ALJ should consider multiple factors, including the length of treatment and frequency of evaluation, the nature and extent of the treating relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating physician. 20 C.F.R. §404.1527(d)(2). Even if the ALJ discounts a treating physician's opinion, the consideration of these factors does not need to be explicit. *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008). The ALJ needs to "minimally articulate" her reasons for discounting the treating physician's opinion, a standard the Seventh Circuit has called "very deferential." *Id.*

The record supports the ALJ's well-articulated analysis and determination to give the "greatest weight" to Dr. Newman's opinion, and "some weight" to the opinions of Drs. Singleton and Williams. R. at 28-9. The ALJ gave Dr. Newman's opinion the "greatest weight," and she explained that she did so for four reasons. R. at 28. First, the ALJ considered Dr. Newman's specialty as an orthopedic surgeon, which equipped him with the

41

expertise to interpret Mr. Stamps' MRI results. R. at 28-9, 564. Dr. Newman testified that Mr. Stamps' MRI results showed a very minor disc problem and that the weakness and numbness on the right side did not result from any peripheral neuropathy, radiculopathy, or herniation. R. at 570, 572. Dr. Newman opined that Mr. Stamps' weaknesses stemmed from a stroke, not a herniated disc, neuropathy, or radiculopathy. R. at 569-70. Dr. Newman did take note of the Joint & Spine Rehabilitation Clinic exam, which showed muscle weakness and numbness. This evidence, however, contrasted with Dr. Newman's review of the normal EMG and the plethora of physical exams showing normal strength, sensation, and reflexes. R. at 569-70.

Next, the ALJ explained that Dr. Newman had the chance to observe and speak with Mr. Stamps at the hearing. R. at 29. At the hearing, Dr. Newman was the only doctor to hear all of Mr. Stamps' testimony; particularly, Mr. Stamps' testimony that the right-side weakness was intermittent and did not affect his ability to sit and that ibuprofen improved his back pain. R. at 539-42, 571. Ibuprofen is an over-the-counter drug, and pain that is controlled by mild or over-the-counter medicine cannot be disabling. *See Clark v. Sullivan*, 891 F.2d 175, 178 (7th Cir. 1989).

Third, the ALJ noted Dr. Newman's familiarity with the requirements of the disability program. R. at 28. When the ALJ

asked Dr. Newman to assess Mr. Stamps' work capacity, Dr. Newman understood the concepts of sedentary and light work when stating that Mr. Stamps could perform sedentary work and lift 10 pounds. R. at 28, 571-72. Dr. Newman decided Mr. Stamps' work capacity by taking into account the Joint & Spine clinic's measurements of atrophy, Mr. Stamps' symptoms, and his obesity. R. at 573. As a result of Dr. Newman's familiarity with the disability program, the ALJ trusted his knowledge in classifying Mr. Stamps capable of performing sedentary, rather than light, work. R. at 571, 573. Finally, the ALJ credited Dr. Newman's testimony because he was the only doctor with full access to Mr. Stamps' medical records and imaging studies. R. at 28-9. Dr. Newman saw the progression and comparison between medical reports and doctors' opinions as a whole, which enabled him to better comment on Mr. Stamps' work capacity. Therefore, the ALJ focused on three factors – the specialty of the doctor, the supportability of the opinion, and its consistency with the record as a whole – in findng that Dr. Newman's opinion was the best supported in the record. The ALJ's findings as to the supportability and consistency of Dr. Newman's opinions are sufficient to "minimally articulate" her reasons for giving greater weight to this opinion, and the Court will not second guess that decision.

Additionally, the ALJ clearly articulated her reasoning for allocating weight among the various medical opinions. R. at 28.

43

First, Mr. Stamps had a primary care physician, Dr. Thornton, during the relevant time. R. at 28, Exhibit 8 F. Dr. Thornton had stated that Mr. Stamps was incapacitated and unable to work in letters dated March, April, June, and October of 2005. R. at 28. However, Dr. Thornton did not provide a detailed RFC opinion, nor did he ever include progress reports about Mr. Stamps. R. at 28, Exhibit 8 F. Another letter from July of 2006 reflects another opinion by Dr. Thornton declaring Mr. Stamps unable to work. R. at 28, Exhibit 9 F. Therefore, the ALJ determined not to give controlling weight to Dr. Thornton, since he only gave generalized opinions without providing documentation or progress notes to support his opinion.

Next, the ALJ considered that Dr. Mercier did eventually release Mr. Stamps to return to work. R. at 28, 317. However, Mr. Stamps did not return to work because of the plant closing during the intervening time. R. at 28, 318. The ALJ gave limited weight to the opinions of the reviewing state agency doctors, because the bulk of the medical evidence had been added to the record in this case after they reviewed the file. R. at 29.

Mr. Stamps contends that the ALJ further erred by not giving more weight to the Joint & Spine clinic doctors. Plaintiff's Brief at 4 - 6. The ALJ evaluated the opinions of Drs. Singleton and Williams, who wrote a letter on March 5, 2008 declaring Mr.

Stamps "totally incapacitated and unable to work in any gainful employment." R. at 28, 265 - 266. The ALJ noted that the doctors completed only a partial RFC report, since neither signed the March 11, 2008 physical exam report. R. at 28, 263, 269-73. The length of treatment totaled three months, after which the doctors stated that Mr. Stamps could not walk farther than one block, sit longer than 15 minutes, or stand longer than 10 minutes. R. at 28, 263, 270. These physicians opined that Mr. Stamps could not work, lift, crouch, squat, or climb a ladder at all. R. at 28, 263.

The ALJ decided to give some weight to these opinions, but she noted that the objective basis for their partial RFC opinion remained unclear. R. at 29. The ALJ emphasized the "objective" basis for the Spine & Joint clinic doctors' opinion, because the record contained only the results of a consultation performed at the Joint & Spine clinic. R. at 29, 269. This visit consisted of Mr. Stamps bringing his medical records to the Spine & Joint clinic for review, so the doctors based their opinions, not on actually treating Mr. Stamps during the visit, but on a review of his previous medical files. R. at 269. Drs. Singleton and Williams did not prescribe any medication for Mr. Stamps; rather the doctors told Mr. Stamps to seek a psychiatrist and follow-up with his treating physician. R. at 273. The ALJ specifically questioned Mr. Stamps about how the Spine & Joint clinic doctors

decided on his limitations, and Mr. Stamps responded by saying that the doctors simply asked him (Mr. Stamps) about his abilities and limitations. As such, the doctors' opinion in this regard is based on a purely subjective, self-reported factor. R. at 576. When asked about any objective tests the doctors may have performed on him, Mr. Stamps referred to "whatever tests they did," and the record shows only a few leg measurements and one SLR test, without noting which leg had been tested. R. at 271 - 272, 576. The ALJ determined that there was only minimal objective evidence supporting the Spine & Joint doctors' opinions, and that most of their conclusions were based upon subjective factors. R. at 271-72, 576.

Mr. Stamps properly points out that 20 C.F.R. §404.1512(b)(1) and 20 C.F.R. §404.1528(b) identify objective medical evidence as medical signs, laboratory findings, or acceptable clinical diagnostic techniques. P's Brief at 3. Mr. Stamps relies heavily on the Spine & Joint doctors' finding of weakness and muscle atrophy to establish his disability. Mr. Stamps references the hand and pinch grip measurements that showed limitations in his right hand. R. at 272. Mr. Stamps contends that the ALJ erred, by not addressing this evidence specifically,. P's Brief at 3. However, in Dr. Newman's opinion, the Spine & Joint doctors' findings were inconsistent with the rest of the record. R. at 569. The decreased bilateral

sensation at the L5-S1 nerve root did not present in any other doctors' opinions except the Spine & Joint doctors. R. at 580. Additionally, Dr. Newman stated that the 2008 normal EMG and the otherwise normal neurological findings contradicted the Spine & Joint doctors' findings of right-side weakness and atrophy. R. at 569, 575, 579. Moreover, Dr. Newman addressed the limited dexterity results of the Spine & Joint doctors, deciding that, even if Mr. Stamps had this condition, he could perform sedentary work. R. at 569, 571-72. Dr. Newman testified that Mr. Stamps could still perform sedentary work if he had even "one or two strokes."

Dr. Newman further testified that Mr. Stamps could still lift ten pounds despite his impairments. R. at 572. The ALJ credited Dr. Newman's finding that Mr. Stamps did not have "significantly reduced ability to use his right hand and arm for grasping, fingering, and feeling items that weigh 10 pounds or less." R. at 21. The ALJ specifically discussed the findings of weakness and atrophy, including exact measurements demonstrating atrophy. R. at 26 - 27. Additionally, the ALJ gave greater weight to Dr. Newman, who also considered the atrophy measurements, stating repeatedly that he could not ignore such measurements. R. at 28, 569, 573-74. Thus, Mr. Stamps' contention that the ALJ "independently determined" that his right side weakness did not significantly limit his ability to work and

"failed to acknowledge" objective testing showing atrophy that constituted a failure to build a "logical bridge" is squarely rebutted by the ALJ's decision. P's Brief at 10 – 11. The ALJ determined that the Spine & Joint doctors' opinion showed inconsistencies with the remainder of the record, and properly accorded Dr. Newman's opinion greater weight. R. at 29. See 20 C.F.R. §404.1527(d)(3) – (4); *See Skarbek v. Barnhart,* 390 F.3d 500, 503 (7th Cir. 2004).

Mr. Stamps further argues that the ALJ erred by failing to explain the weight she gave to Dr. Gireeson's opinion. P's Brief at 6. Dr. Gireeson suggested that Mr. Stamps needed to change between sitting and standing every half hour of working to deal with his pain. R. at 230. However, the record shows that Dr. Gireeson did not find any tenderness, sensory changes, weakness, or reflex changes in Mr. Stamps and noted that Mr. Stamps walked with a normal gait and ambulation. R. at 229. Dr. Gireeson did find Mr. Stamps unable to return to the heavy work he performed at the bakery; however, he did not declare Mr. Stamps unable to return to a sedentary job. R. at 231. In fact, Dr. Gireeson opined that Mr. Stamps could lift ten pounds, sit, stand and walk for one half hour at a time, alternating between positions. R. at 230.

Regardless of the rotation Mr. Stamps needed, the VE testified that a rotation between sitting and standing during the

48

workday was "the minimum for anyone to maintain a rate at any job." R. at 587. As Mr. Stamps pointed out, the VE did admit that the individual would have to work quickly. P's Brief at 6 - 7, R. at 587. However, the ALJ did not need to investigate whether Mr. Stamps could work quickly; none of the doctors indicated the speed at which Mr. Stamps could perform a job nor did Mr. Stamps complain of such a limitation. Absent such evidence, the ALJ's failure to discuss Dr. Gireeson's opinion in this regard is, at best, harmless error. *Keys v. Barnhart,* 347 F.3d 990, 994 - 995 (7th Cir. 2003) (an ALJ's oversight is harmless if no other conclusion could be reached on remand.) In light of the VE's testimony that working while alternating positions was a minimum requirement, and in light of the lack of evidence or allegation that Mr. Stamps could work only at a slower pace, any error on the ALJ's part in failing to mention Dr. Gireeson's limiation is harmless.

**B. The ALJ's Failure to Re-contact the Spine & Joint Clinic Doctors or to Order A Consultative Examination**

Mr. Stamps argues that the ALJ should have re-contacted the Spine & Joint clinic doctors or ordered a consultative exam in response to Dr. Newman's testimony. P's Brief at 13. Mr. Stamps argues that, without another consultative exam, the ALJ could not have properly determined how the atrophy and weakness affected Mr. Stamps' ability to work. P's Brief at 11. To the contrary,

Dr. Newman's testimony took into account the atrophy and weaknesses reflected in the Spine & Joint doctors' examination; in fact, he testified that the findings could not be ignored, indicating that he found them to be significant. R. at 568-69, 573-74. Yet, Dr. Newman nonetheless concluded that Mr. Stamps could work. R. at 571-73.

Mr. Stamps also argues that the fact that Dr. Newman suggested that Mr. Stamps have another neurological examination shows that even Dr. Newman remained unsure of what caused the weakness and atrophy. R. at 580. Even accepting Mr. Stamps' argument, Dr. Newman concluded that Mr. Stamps could nonetheless lift 10 pounds and could still perform sedentary work, despite these limitations and regardless of their cause.. R. at 571-73. The "mere diagnosis" of weakness and atrophy does not establish functional limitations, severe impairments, or an inability to work. *See Anderson v. Sullivan,* 925 F.2d 220, 222 (7th Cir. 1991). The exact cause of the weakness/atrophy is essentially irrelevant; the extent of Mr. Stamps' functional limitations formed the determinative factor in the ALJ's decision, and this was proper.

Mr. Stamps contends that the ALJ's failure to re-contact the Spine & Joint Clinic prevented him from determining the extent of Mr. Stamps' limitations. P's Brief at 11. Recontacting the doctors for a consultative exam, however, usually falls squarely

within the ALJ's discretion.  See SSR 96-6p.  If the ALJ could
not make a determination based on the evidence presented, the
regulations would require the ALJ to re-contact the appropriate
doctors for clarification or further information.  See 20 C.F.R.
§404.1527(c)(3).  But in this case, the ALJ had sufficient
evidence to make her decision; she had the opinions of multiple
doctors, surgery records, physical therapy records, and testimony
from the ME and Mr. Stamps himself.  Dr. Newman's conclusions
were consistent with the medical evidence showing Mr. Stamps'
ability to work: Dr. Gottlieb reported successful surgery in
October of 2004; Dr. Mercier told Mr. Stamps to return to work in
October of 2004 after a normal physical exam; Dr. Heller
described Mr. Stamps as "healthy looking" but demonstrating
"excessive" pain behavior; the physical therapist reported Mr.
Stamps healthy enough to return to work; Dr. Gireeson noted that
Mr. Stamps had a normal ambulation and would be unable to do only
heavy-duty work.  R. at 229, 231, 317, 382, 385, 391.  This
evidence forms a sufficient basis for the ALJ's decision, and she
did not err in failing to recontact the Spine & Joint clinic
physicians for clarification.

## C.  Credibility of Mr. Stamps

Mr. Stamps next argues that the ALJ erred by failing to
explain her reasons for finding that Mr. Stamps' testimony was
not fully credible.  The ALJ's credibility determination is

reviewed with deference. See *Craft v. Astrue,* 539 F.3d 668, 678 (7th Cir. 2008). This Court will sustain the ALJ's credibility determination unless it is "patently wrong" and not supported by the record. *See Schmidt v. Astrue,* 496 F.3d 833, 843 (7th Cir. 2007); *see also Prochaska,* 454 F.3d 731, 738 (7th Cir. 2006) ("only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed") The ALJ's "unique position to observe a witness" entitles her opinion to great deference. *See Nelson v. Apfel,* 131 F.3d 1228, 1237 (7th Cir. 1997). An ALJ's credibility determination must contain specific reasons for her finding. *Steele v. Branhart,* 290 F.3d 936, 942 (7th Cir. 2002).

When assessing the claimant's credibility, the ALJ does not need to rely on a recitation of the claimant's subjective complaints where it is not supported by the objective evidence. *See Rice v. Barnhart,* 384 F.3d 363, 371 (7th Cir. 2004). Instead, the ALJ should consider all factors, such as the objective medical evidence, the claimant's daily activities, allegations of pain, aggravating factors, types of treatment received and medications taken, and functional limitations to determine credibility. *See Simila v. Astrue,* 573 F.3d 503, 517 (7th Cir. 2009).

In her opinion, the ALJ found that Mr. Stamps' testimony was not fully credible, in part, because his statements regarding his

impairments and the effect they had on his ability to work were inconsistent with the RFC assessment. R. at 30. The ALJ did find that Mr. Stamps' impairments could reasonably be expected to produce the alleged symptoms, but she found that Mr. Stamps' statements "concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the RFC assessment." R. at 30.

Mr. Stamps argues that the ALJ erred in considering his treatment history in formulating her credibility determination, because he explained that a lack of insurance prevented him from seeking treatment. P's Brief at 18, R. at 30. The ALJ noted that Mr. Stamps sought regular treatment in 2004 and through the beginning months of 2005, but then discontinued treatment until just before the date of the disability hearing. R. at 30-31. Mr. Stamps argued that he did not have insurance to pay for treatment, nor did he know treatment was available free of charge. P's Brief at 18. Noting that Mr. Stamps received $105,000 to settle his workers compensation case, the ALJ determined that, had Mr. Stamps been in as much pain as he said, he would have paid for medical appointments and treatment. R. at 31, 118-120, 286, 482. The ALJ also disbelieved Mr. Stamps, because she found that he was "obviously familiar" with the availability of free treatment at Stroger Hospital, having used that option in the past. R. at 31. Therefore, the ALJ did not

err in considering Mr. Stamps' treatment history as relevant to his disability claim.

Also significant to the ALJ was the fact that Mr. Stamps rarely used medication. R. at 31. Most of Mr. Stamps' prescription drug usage occurred between his 2004 surgery and the beginning of 2005. R. at 337, 412. Otherwise, doctors either prescribed only Motrin, Ibuprofen, or rounds of physical therapy. R. at 351, 373, 380. When after a car accident his back pain flared up again in 2006, Mr. Stamps was released from the hospital with instructions to take Motrin and use ice. R. at 279. Even though Dr. Heller believed Mr. Stamps demonstrated "excessive pain behavior," Dr. Heller's notes showed that Mr. Stamps refused the additional pain medication she offered to prescribe for him. R. at 382, 386-87. Though the use of over-the-counter medication to control pain is not dispositive, the use of milder pain medications such as Motrin and Ibuprofen undercuts Mr. Stamps' subjective complaints of pain. *See Clarke,* 891 F.2d 175, 178 (7th Cir. 1989).

Finally, Mr. Stamps argues that the ALJ should not have attached any significance to the plant's closing as evidence of his ability to work. P's Brief at 19. When Dr. Mercier recommended that Mr. Stamps return to light duty at work in October of 2004, Mr. Stamps reported that he was unable to do so, because the plant had closed. R. at 317 – 318. Mr. Stamps

argued in his brief that "people cannot return to work when their jobs no longer exist" which leaves open the suggestion that Mr. Stamps could work if the plant had remained open.  P's Brief at 19.

As to Mr. Stamps' daily activities, the ALJ stated that his business and personal activities suggested that he has a "good ability to function despite his complaints of continuing back pain."  R. at 31.  The ALJ also found Mr. Stamps' statements inconsistent with the objective evidence, which indicated that Mr. Stamps' impairments did not rise to the level of severity which would preclude him from performing sedentary work.  R. at 30.

Mr. Stamps argued that the ALJ mischaracterized his daily activities by making broad generalizations.  P's Brief at 12. Mr. Stamps testified that he does "a few things" around the house and manages a building, performing tasks such as hiring repairmen, collecting rent, and paying bills.  R. at 550-51. However, the ALJ considered Mr. Stamps' testimony that he did basic cleaning chores, laundry, cooked between 30 – 40 minutes at a time, cut the grass just three months before the hearing and does weekly yard work, though he does hire someone to do repair work or maintenance tasks.  R. at 30, 190, 551.  Mr. Stamps argues that these daily activities do not prove him capable of working a full-time schedule, especially given that his pain also

diminished his ability to work. P's Brief at 13. But the ALJ did not determine that Mr. Stamps' daily activities prove he can work full time; rather, she determined that they contradict his claims of constant, disabling pain and render him incredible.

Undeterred, Mr. Stamps cites to *Villano v. Astrue*, where the court found that the ALJ erred by failing to explain whether the claimant's daily activities were consistent with the alleged limitations, by failing to analyze the required factors under SSR 97 – 6p, or to have a sufficient reason for discrediting claimant's testimony. *See* 556 F.3d at 562 – 563 (7th Cir. 2009). Here, the ALJ did question Mr. Stamps about his daily activities. R. at 30, 550-51. The ALJ also found that, although Mr. Stamps may have experienced some pain, limitations, and restrictions from his impairments, the medical record in its entirety demonstrated that Mr. Stamps had no greater limitations in his ability to perform work activities than those reflected in the RFC assessment. R. at 30.

In contrast to the ALJ in *Villano*, ALJ Cropper analyzed in detail the relevant factors, including the daily activities. R. at 29 – 31. The ALJ explained that the daily activities of some household chores, cooking, and driving contradicted Mr. Stamps' alleged limitations – all the activities together show that Mr. Stamps had a "good ability to function *despite his complaints of continuing back pain*." R. at 31 (emphasis added). Importantly,

the ALJ determined that Mr. Stamps had a good ability to function, not that he could work full time, based on his daily activities.  R. at 31.  Although the ALJ did not point to specific inconsistencies in Mr. Stamps' statements regarding his activities of daily living, she did reference Mr. Stamps' ability to carry out activities of daily living in deciding that Mr. Stamps' testimony was not fully credible.  *See Allen v. Astrue,* 2010 WL 2607265, *12 (N.D. Ill. 2010).

This Court finds that the ALJ acted properly in viewing Mr. Stamps' subjective statements in light of the objective medical evidence.  R. at 29 – 31.  Accordingly, the Court finds that the ALJ did not err in failing to provide more explicit reasons for discounting Mr. Stamps' testimony.

## CONCLUSION

For the reasons set forth above, the Court Denies Mr. Stamps' Motion for Summary Judgment, and Grants the Commissioner's Motion for Summary Judgment.

Dated: December 10, 2010      E N T E R:



ARLANDER KEYS
United States Magistrate Judge